[Civ. No. 17758.   Second Dist., Div. One.   Feb. 7, 1951.]

ANN AYLWARD, Appellant, v. GRACE M. WELLS et al.,
Respondents.

Barry Sullivan and Harry V. Leppek for Appellant.

Charles E. Beardsley for Respondents.

HANSON, J. pro tem.—Only two questions are presented
for decision, one as to the sufficiency of the evidence to sustain
the judgment, and the other as to certain rulings on evidence.

After the rejection of her three separate claims filed against
the estate of George D. Wells, deceased, plaintiff instituted
this action setting forth three counts in her complaint.   The
first count avers that plaintiff supplied the decedent Dr.

Wells with $2,000 on August 15, 1946, under an oral agreement that he would purchase two specified lots and hold title thereto in his and her behalf as equal beneficiaries. The count averred the due presentation to and rejection by the administratrix of Wells of this claim.

The second count likewise predicated on one of the claims filed by her avers a loan by plaintiff of $7,000, in installments, beginning with November 14, 1946, and ending February 6, 1948, the last installment being in the sum of $2,150. (The decedent Wells died on February 9, 1948.) This count likewise avers the due presentation to and rejection by the administratrix of this claim. Parenthetically it should here be stated that the claim, as filed, asserted plaintiff "invested" the moneys "in the business of George D. Wells, deceased, known as George D. Wells Emergency Hospital," whereas the count predicated upon this claim sought a recovery on the theory of a loan to Dr. Wells and not as an "investment" in his business.

The third count avers that in 1927 the plaintiff and Dr. Wells entered into an oral contract to devote their time and effort in developing the medical business of Dr. Wells and that whatever property they acquired should be owned and shared equally although title thereto was to stand in decedent's name; that the parties operated accordingly for 20 years up to May, 1947, when plaintiff left her employ temporarily but was induced to return upon the representation that the doctor had drawn a will and executed other written documents by which it would be shown plaintiff was a half-owner of the medical business and of all his other property; and moreover, if he predeceased her, she would be invested with his interest in the business and of all his property. Upon such representation plaintiff avers she returned and continued to work in the business until decedent's death less than a year later.

The testimony of the plaintiff was substantially in accord with the allegations of her complaint. The only corroboration for any of her testimony may now briefly be stated. Her witness Contessoto testified that decedent, on an occasion when he made a loan to him, remarked that he and the plaintiff had jointly bought the two lots here involved. The witness Niemann's testimony was that the decedent told him that he and the plaintiff were purchasing property together; that at the time he saw "a pile" of money on the doctor's desk and the latter mentioned it was to be used in buying two lots. Witness Sherman testified that she was in the office when the

doctor gathered up the money stating that he was going to the bank to get a cashier's check for it; that when the doctor returned he told the witness that the clerk at the bank had asked him if he had been "playing craps" the night before because of the many small bills tendered in payment thereof; that the doctor handed the cashier's check to the plaintiff who put it in an envelope, addressed, and mailed it; that some weeks later the witness heard the doctor say to plaintiff: "Ann, let's make $1,000 on our lot." The witness Gertrude Wolferman testified Wells told her that "Everything he had belonged to Ann."

From these recitals it is evident, in view of the judgment, that the trial court did not believe the testimony of the plaintiff and her witnesses.

We turn at once to set forth a résumé of the evidence that tended to contradict the case of the plaintiff. It appears that the plaintiff first met the decedent Dr. Wells in 1924. The doctor had an M.D. degree and at the time was operating an industrial hospital. He was married and had two daughters. According to the testimony of plaintiff he told her in conversations between February and June, 1927, that he was "going broke"; that if plaintiff would come to the hospital and aid him the two would "share and share alike" in the business. On that basis she went to work for him and continued with him uninterruptedly for 20 years. At the beginning she received an irregular and not specific salary, but by 1937 he was giving her a regular salary and at the time of his death she was getting a salary of $350 a month.

We pause to observe that there is nothing in the record to indicate that plaintiff in 1927 was a nurse or had any business or hospital experience or for that matter any qualifications. Why then would a doctor with a medical degree, a family to support, and an established business divide his net earnings arising from his professional ability with a person who seemingly, at best, was equipped perhaps to do menial work, or act as a receptionist, and keep the doctor's simple account books? Then again why was she paid a salary at all if she was to receive half the net income from his professional business?

Plaintiff testified that the doctor to her knowledge had borrowed moneys from three different persons at different times for the business. He gave them promissory notes, but in no instance did she sign any of them despite her alleged

interest in the business. She deposited the moneys he thus borrowed to one of his bank accounts. There was no bank account in which the two shared or upon which she could draw checks. He, however, had two bank accounts; one personal, the other for his business. The plaintiff had no bank account of her own. She testified she at all times had a considerable amount in cash, mostly in bills of large denomination. All this she kept in a bureau drawer in her home. She says she loaned the doctor $7,000 in currency in the space of two years —all of it came from the bureau drawer. What she loaned him, she says, did not go into his bank accounts, but instead he carried it in his pockets. She loaned him the moneys "when he was hard up" to pay specific bills. The showing by his bank records was that he had adequate funds in the bank to pay the bills mentioned by her. What is more it was shown the bills were paid by checks on his account and not by cash derived from her. While others got promissory notes for the moneys they loaned the doctor, plaintiff did not nor did she even request as much as a scrap of paper to evidence the loans she made to him. The plaintiff made loans aggregating $3,150 after May, 1947 (when she says she threatened to sue Dr. Wells), and neither got nor took any memorandum to evidence the loans.

While the plaintiff kept or at least supervised the account books of the doctor, she never requested him to enter therein any liability in her favor. After having testified that her loans to the doctor were deposited in his bank accounts, she was compelled to retract her testimony when the bank records were shown to her. She then took the position that he always carried the currency she loaned him in his pockets. We need not further recite the numerous additional conflicts in plaintiff's own testimony. It is enough to point out that there was a similar definite conflict in the testimony of plaintiff's principal witness. In view of this narrative of the facts it is self evident that the trial judge found himself unable to credit the testimony of the plaintiff. We fail to see, after a review of the record, how he could have arrived at any other judgment than the one he rendered.

██ There remains for consideration, however, the contention of appellant that the court erroneously excluded certain evidence which would have had a material bearing in sustaining her case. We agree with appellant that what she sought to prove was relevant, but we cannot agree that it would have helped in sustaining her case. Moreover, the difficulty with

all the questions put by counsel for appellant is that the form of the questions was objected to and properly sustained on that ground. We do not stop to discuss in detail the rulings as to us it is crystal clear that they were correct.

The judgment is affirmed and the appeal from the order denying a motion for a new trial is dismissed.

White, P. J., and Doran, J., concurred.